# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LEROY MANZANARES,

       Plaintiff,

vs.                                        No. CIV 16-0765 JB/KRS

ROOSEVELT COUNTY ADULT
DETENTION CENTER; BOARD OF
COMMISSIONERS OF THE COUNTY OF
ROOSEVELT; EDDY COUNTY
DETENTION CENTER; BOARD OF
COMMISSIONERS OF THE COUNTY OF
EDDY; SENOVIO MENDOZA, JR.;JOHN
AND JANE DOE Detention officers of the
Roosevelt County Detention Center;
JOHN DOES 1-X; JANE DOES 1-X; BLACK
AND WHITE CORPORATIONS; LARRY
PHILLIPS; CHARLENE WEBB; JOHN
DOE; JANE DOE; BILLY MASSINGILL;
JOHN DOE and JANE DOE

       Defendants.

## MEMORANDUM OPINION AND AMENDED ORDER[1]

---

[1] The Court previously issued an Order, filed September 25, 2017 (Doc. 47)("Order") that granted in part and denied in part the requests in: (i) the Defendant Board of Commissioners of the County of Eddy's Amended Motion to Dismiss Plaintiff's First Amended Complaint and Memorandum in Support Thereof, filed November 22, 2016 (Doc. 9); (ii) the Motion to Dismiss Plaintiff's Amended Complaint on Behalf of Board of Commissioners of the County of Roosevelt, Larry Phillips, and Charlene Webb, filed December 2, 2016 (Doc. 10); (iii) Defendant Massingill's Motion to Dismiss Plaintiff's Complaint Based in part on Qualified Immunity and Memorandum in Support Thereof, filed April 12, 2017 (Doc. 24); and (iv) Amended Motion to Dismiss Plaintiff's Amended Complaint on Behalf of Board of Commissioners of the County of Roosevelt, Larry Phillips, and Charlene Webb, filed May 5, 2017 (Doc. 33). See Order at 3, filed September 25, 2017 (Doc. 47)("Order"). In that Order, the Court stated that it would issue a Memorandum Opinion "detailing its rationale and confirming that this Order is correct." Order at 1 n.1. This Memorandum Opinion is the promised Memorandum Opinion. It is labeled a Memorandum Opinion and Amended Order, however, because it amends the Order, such that the federal claims against Defendants Senovio Mendoza, Jr., John and Jane Doe Detention Officers of the Roosevelt County Detention Center, John Does 1-X, Jane Does 1-X, Black and White Corporations, and all John Does and Jane Does are dismissed without prejudice. See infra, n.20.

**THIS MATTER** comes before the Court on: (i) Defendant Board of Commissioners of the County of Eddy's Amended Motion to Dismiss Plaintiff's First Amended Complaint and Memorandum in Support Thereof, filed November 22, 2016 (Doc. 9)("EC Motion"); (ii) the Motion to Dismiss Plaintiff's Amended Complaint on Behalf of Board of Commissioners of the County of Roosevelt, Larry Phillips, and Charlene Webb, filed December 2, 2016 (Doc. 10)("RC Motion"); (iii) Defendant Massingill's Motion to Dismiss Plaintiff's Complaint Based in part on Qualified Immunity and Memorandum in Support Thereof, filed April 12, 2017 (Doc. 24)("Massingill Motion"); and (iv) the Amended Motion to Dismiss Plaintiff's Amended Complaint on Behalf of Board of Commissioners of the County of Roosevelt, Larry Phillips, and Charlene Webb, filed May 5, 2017 (Doc. 33)("Amended RC Motion"). The Court held a hearing on September 22, 2017. The primary issues are: (i) whether Defendants Eddy County Detention Center and Roosevelt County Adult Detention Center may be properly sued under 42 U.S.C. § 1983; (ii) whether Defendant Board of Commissioners of the County of Eddy violated Plaintiff Leroy Manzanares' due process rights when a purported policy it had led to an inmate attacking Manzanares with a pickaxe; (iii) whether Defendant Board of Commissioners of the County of Roosevelt violated Manzanares' due process rights on a similar theory; (iv) whether Defendants Larry Phillips, Charlene Webbs, and Billy Massingill, as decisionmakers at Roosevelt County Detention and Eddy County Detention, are liable under due process for the same conduct; and (v) whether the Court should dismiss Manzanares' state claims. The Court concludes: (i) Eddy County Detention and Roosevelt County Detention are not persons, so cannot be sued under § 1983; (ii) Eddy County's purported policy does not shock the conscience, so there is no due process violation; (iii) Roosevelt County's purported policy likewise does not shock the conscience; (iv) Manzanares' allegations against Phillips, Webb, and Massingill are conclusory,

but even if they were not, there is no due process violation and they are entitled to qualified immunity; and, (v) with no remaining federal claims, the Court will dismiss the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3) ("[T]he district courts may decline to exercise jurisdiction [if] . . . the district court has dismissed all claims over which it has original jurisdiction."). The Court, accordingly, grants in part and denies in part the requests in the EC Motion, the RC Motion, the Massingill Motion, and the Amended RC Motion. The Court dismisses the Plaintiff's First Amended Complaint, filed November 11, 2016 (Doc. 5)("FAC" or "Amended Complaint"), without prejudice.

## FACTUAL BACKGROUND

The Court takes its facts from the Amended Complaint. The Court accepts its factual allegations as true for the purposes of a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)("Twombly"). The Court does not, however, accept as true the legal conclusions within the FAC. See Ashcroft v. Iqbal, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Manzanares is a Roosevelt County employee and groundskeeper. See FAC ¶ 18, at 4; id. ¶ 21, at 5. On July 2, 2014, Manzanares was doing maintenance on the Roosevelt County Fairgrounds, when Roosevelt County Detention lent Manzanares an inmate -- Defendant Senovio Mendoza -- to aid Manzanares in his work. See FAC ¶ 19, at 5. Manzanares, as someone with no connection to Roosevelt County Detention, believed that such a facility would provide only "non-violent offender[s]" to aid him in his job. FAC ¶ 21, at 5. To the contrary, however, Mendoza had a history of violence and also faced first-degree murder charges. See FAC ¶¶ 20, 22 at 5. Indeed, according to the criminal complaint pending against Mendoza,

Mendoza had impersonated a Drug Task Force Agent, broke into a drug dealer's home, and, moments after forcing that drug dealer to the floor, executed him with a bullet to the head. <u>See</u> FAC ¶ 29, at 6. Mendoza had also previously been convicted of armed robbery, aggravated battery, and had "violently beat another inmate" over a television. FAC ¶ 34, at 7. <u>See</u> <u>id.</u> ¶ 43, at 8. Roosevelt County Detention did not tell Manzanares any of those facts. <u>See</u> FAC ¶¶ 20, at 5.

At some point while aiding Manzanares, Mendoza acquired a pickaxe and attacked Manzanares, "splitting part of his head open, instantly knocking him unconscious." FAC ¶ 23, at 5. Mendoza then stole a vehicle and sped away, leaving Manzanares for dead. <u>See</u> FAC ¶ 23, at 5. Manzanares survived but sustained an extensive head injury. <u>See</u> FAC ¶¶ 24, 37, 39, at 5, 7.

Before the pickaxe attack, Mendoza was housed at Eddy County Detention. <u>See</u> FAC ¶ 25, at 5. Eddy County Detention and Roosevelt County Detention maintain a detainee transfer agreement should one of the detention centers become overcrowded, but transfers between the two facilities are allowed only if the offender is non-violent. <u>See</u> FAC ¶¶ 26, 30 at 6. Despite this limitation, Eddy County Detention transferred Mendoza to Roosevelt County Detention. <u>See</u> FAC ¶ 25, at 5. In executing that transfer, Eddy County Detention knew of Mendoza's history and pending criminal charges but misrepresented those details to Roosevelt County Detention telling that facility that "Mendoza was merely a murder witness and not a murder suspect." FAC ¶ 28, at 6. <u>See</u> <u>id.</u> ¶ 27, at 6.

Although Eddy County Detention misrepresented Mendoza's history to Roosevelt County Detention, Roosevelt County Detention "should have done a background check" on Mendoza before accepting him. FAC ¶ 31, at 6. Roosevelt County Detention did not perform that background check, however. <u>See</u> FAC ¶¶ 31-32, at 6-7. Such a background check would

have revealed that Mendoza had previously attacked another inmate and, thus, that Mendoza was a threat to society not fit for a work assignment on the Roosevelt County Fairgrounds.  See FAC ¶¶ 34-35, 42, 44 at 7-9.

## PROCEDURAL BACKGROUND

Manzanares sues, asserting negligence and that the Defendants violated his substantive due process rights.  See FAC ¶¶ 60-80, at 12-15.  On due process, he contends that the Defendants acted arbitrarily and capriciously, depriving him of the guarantee that he will not be deprived of life, liberty, or property.  See FAC ¶ 61, at 12.  He also contends that the Defendants failed to train their penitentiary personnel, and that they knew or should have known that Mendoza should not have been transferred to Roosevelt County Detention or assigned to help Manzanares on the Fairgrounds.  See FAC ¶¶ 62-65, 68-70, at 12-14.  Finally, he asserts that Eddy County Detention has a policy, practice, or custom of "dumping unwanted inmates onto other detention facilities" regardless of those inmates' safety classifications and Roosevelt County Detention was aware of that practice, but did nothing to stop it.  FAC ¶ 66, at 13.  See id. ¶ 67, at 13.  On negligence, he argues that the Defendants owed a duty to Manzanares and breached that duty for failing to properly classify Mendoza, resulting in Manzanares' injuries. See ¶¶ 72-80, at 14-15.

### 1.    The EC Motion.

Eddy County moves to dismiss.  See EC Motion at 1.  First, it argues that the Court should dismiss the FAC's claims against Eddy County Detention, because "governmental sub-units," such as detention centers, "are not properly suable entities in § 1983 actions."  EC Motion at 1, n.1 (citing Martinez v. Winner, 771 F.2d 424, 444 (10th Cir. 1985)).  Eddy County asserts, moreover, that it cannot be liable for any conduct, because Manzanares asserts no constitutional

violation and no county policy that "was the moving force behind the violation." EC Motion at 6 ("Indeed, it appears that the actions complained of would not be as a result of a policy, but rather necessarily would be due to a breach thereof."). Eddy County also argues that there are no allegations of the County's "deliberate conduct," which would give rise to a constitutional violation. See EC Motion at 7-8; id. at 8 n.4.

Eddy County avers that Manzanares' negligence claim fails too, because Eddy County has not waived its sovereign immunity. See EC Motion at 8-9. It also argues that Manzanares' tort claim is time barred, because it appears to have occurred more than two years before Manzanares filed his complaint. See EC Motion at 9. Eddy County requests the Court, accordingly, to dismiss the claims against Eddy County and Eddy County Detention with prejudice. See EC Motion at 9.

### 2. **The RC Motion.**

Roosevelt County, Phillips, and Webb move to dismiss. See RC Motion at 1. They argue that the Court should dismiss Roosevelt County Detention, because "governmental subunits cannot be sued as a separate entity from the County itself in § 1983 cases." RC Motion at 2. See id. at 5. Roosevelt County, Phillips, and Webb argue that the Court should dismiss the claim against Roosevelt County, because Manzanares has not alleged a policy or custom that caused a constitutional injury. See RC Motion at 5-6. They also assert that Roosevelt County cannot be liable "for acts of its employees on a *respondeat superior* theory," which, according to Roosevelt County, Phillips, and Webb, is all that Manzanares has alleged. RC Motion at 6 (emphasis in original). Roosevelt County, Phillips, and Webb add that the Court should dismiss the individual capacity suits against Phillips and Webb, because all Manzanares has alleged is supervisory liability, which is not actionable under 42 U.S.C. § 1983. See RC Motion at 7-8.

Roosevelt County, Phillips, and Webb argue that the negligence claims fails, because the New Mexico Workers' Compensation Act, N.M. Stat. Ann. §§ 52-1-1 to -70 ("WCA"), provides the exclusive remedy when a government employee is injured during the course of employment. See RC Motion at 8-10. Finally, they argue that the Court should dismiss the punitive damage claim, because counties and municipalities are "immune to punitive damages in § 1983 cases." RC Motion at 10. Accordingly, they request that the Court dismiss the action against Roosevelt County, Roosevelt County Detention, Phillips, and Webb. See RC Motion at 10.

### 3.    EC Motion Response.

Manzanares responds to the EC Motion. See Plaintiff's Response to Defendant Eddy County Board of Commissioners' Amended Motion to Dismiss Plaintiff's First Complaint and Memorandum in Support Thereof at 1, filed December 8, 2016 (Doc. 12)("EC Motion Response"). He contends that Eddy County is liable, because it misrepresented Mendoza's criminal history to Roosevelt County Detention. See EC Motion Response at 5. According to Manzanares, that misrepresentation demonstrates that Eddy County was, at least, deliberately indifferent to Manzanares' safety, establishing a constitutional violation. See EC Motion Response at 6-8. He adds that, beyond mere deliberate indifference, however, Eddy County "deliberately created" the danger that led to Manzanares' harm, which, according to Manzanares, is actionable under § 1983 as a danger-creation claim. See EC Motion Response at 9.

Manzanares contends that there is no statute of limitations problem on his negligence claim, because the triggering event occurred on July 2, 2014, and he filed his complaint on July 1, 2016 -- within the two-year period. See EC Motion Response at 10. He also argues that he has a negligence claim's elements, because Eddy County breached its duty to prevent dangerous inmates from being transferred, which resulted in the pickaxe attack causing Manzanares harm.

<u>See</u> EC Motion Response at 10-11.  Accordingly, Manzanares requests that the Court deny the EC Motion.  <u>See</u> EC Motion Response at 11.

**4.      RC Motion Response.**

Manzanares responds to the RC Motion.  <u>See</u> Plaintiff's Response to Defendant Board of Commissioners of the County of Roosevelt's Motion to Dismiss Plaintiff's First Amended Complaint at 1, filed December 8, 2016 (Doc. 12)("RC Motion Response").  Manzanares argues that, because Roosevelt County Detention failed to screen a violent inmate from working in the community, it violated Manzanares' due process rights.  <u>See</u> RC Motion Response at 4.  He adds that Roosevelt County's failure to train its employees to properly screen inmates demonstrates deliberate indifference to a potential constitutional violation, creating liability.  <u>See</u> RC Motion Response at 5.

Manzanares argues that his state claim meets the WCA standards, because Roosevelt County Detention staff recklessly disregarded Mendoza's danger to the public, which was expected to result and resulted in an injury.  <u>See</u> RC Motion Response at 7-8.  He contends, accordingly, that the WCA does not provide immunity from his tort claim.  <u>See</u> RC Motion Response at 8.  Manzanares concludes by asking the Court to deny the RC Motion.  <u>See</u> RC Motion Response at 8-9.

**5.      EC Reply.**

Eddy County replies.  <u>See</u> Defendant Board of Commissioners of the County of Eddy's Reply Memorandum for its Motion to Dismiss Plaintiff's First Amended Complaint at 1, filed December 14, 2016 (Doc. 15)("EC Reply").  It asserts that Manzanares fails to establish a constitutional violation, because "[t]here is no alleged policy, no alleged practice, no alleged failure to train or supervise, and no alleged decision by any final decision-maker."  EC Reply at

6. Eddy County contends that Manzanares has not alleged a danger-creation claim, as he "fails to identify the alleged state actor or their purported actions." EC Reply at 7. Eddy County also argues that, even if some of the elements of a danger-creation claim are met, he has not alleged conduct that would "shock the conscience." EC Reply at 8. According to Eddy County, negligence is not conduct that would shock the conscience. See EC Reply at 8 (citing Glover v. Gartman, 899 F. Supp. 2d 1115, 1135-36 (D.N.M. 2012)(Browning, J.)). Eddy County avers that Manzanares has not even argued, let alone established, that the state waived its sovereign immunity for his tort claim. See EC Reply at 8.

### 6. **RC Reply.**

Roosevelt County, Phillips, and Webb reply. See Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiff's Amended Complaint at 1, filed January 6, 2017 (Doc. 20)("RC Reply"). They argue that Manzanares has not stated a plausible claim, because "[t]here is no reference in the allegations to any specific written policy promulgated by Roosevelt County which directly led to the damages claimed." RC Reply at 8. Roosevelt County, Phillips, and Webb contend that, "[a]t best," Manzanares "alleges a one-time occurrence" without any indication about "what training and supervision should have been carried out" and "by whom." RC Reply at 9. Roosevelt County, Phillips, and Webb aver that the Court should dismiss the claims against Phillips and Webb, because Manzanares' lone allegation against them that "they have final responsibility for training, supervision, and policy implementation" does not trigger § 1983 liability. RC Reply at 12 ("There is no allegation against these individuals of personal involvement in the alleged wrongdoing."). Finally, Roosevelt County, Phillips, and Webb contend that the Court should dismiss the negligence

claim, because, under the WCA, the plaintiff must allege an intentional act, but, here, Manzanares alleges "deliberate indifference and/or reckless disregard." RC Reply at 13.

### 7.      **Massingill Motion.**

Massingill moves to dismiss, arguing that he is entitled to qualified immunity. <u>See</u> Massingill Motion at 1. Massingill contends that he is entitled to qualified immunity, because he did not cause any constitutional harm. <u>See</u> Massingill Motion at 7 ("[T]he Plaintiff has failed to allege that Defendant Massingill authorized or approved the alleged misconduct."); <u>id.</u> at 11 ("Defendant Massingill submits that there is no well plead factual allegation that he personally violated Plaintiff's constitutional rights."). He argues that Manzanares, at best, asserts conclusory allegations about "inadequate supervision and training," which, according to Massingill, do not amount to a § 1983 violation. Massingill Motion at 7. Accordingly, he requests that the Court dismiss the claims in the FAC against him. <u>See</u> Massingill Motion at 11.

### 8.      **Massingill Motion Response.**

Manzanares responds to the Massingill Motion. <u>See</u> Plaintiff's Response to Defendant Massingill's Motion to Dismiss Plaintiff's Complaint and Memorandum in Support Thereof [Doc 24] at 1, filed May 5, 2017 (Doc. 32)("Massingill Motion Response"). Manzanares contends that, as Eddy County Detention's warden, Massingill is "directly responsible" for overseeing "ECDC's involvement in all contractual arrangements, detention officer training, and proper classification of inmates." Massingill Motion Response at 4. Thus, according to Manzanares, Massingill's failure to take measures to prevent Mendoza's transfer or notify Roosevelt County Detention about Mendoza's violent history amounts to a constitutional violation. <u>See</u> Massingill Motion Response at 4; <u>id.</u> at 6-7 ("The fact that Defendant Massingill allowed for such a violent individual to be transferred with no warning is absolutely shocking to

the conscious and was certainly committed with deliberate indifference.").  Manzanares contends

that Massingill is not entitled to qualified immunity, because the Supreme Court has clearly

established the right that there is a due process violation when "state's affirmative actions either

create or increase risk of private violence."  Massingill Motion Response at 9-10 (citing

Deshaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  Accordingly,

Manzanares requests that the Court deny the Massingill Motion.  See Massingill Motion

Response at 13.

### 9.    **Amended RC Motion.**

Roosevelt County, Phillips, and Webb file the Amended RC Motion to raise one

additional ground to dismiss Manzanares' negligence claim.  See Amended RC Motion at 1.[2]

They argue that the Court must dismiss the negligence claim, because the New Mexico Tort

Claims Act, N.M. Stat. Ann. §§ 41-4-1- to -30 ("NMTCA"), provides the exclusive remedy for

tort claims against public officials and governmental entities, and Manzanares does not identify a

waiver of immunity in his Amended Complaint.  See Amended RC Motion at 10.   Accordingly,

they request that the Court dismiss the negligence claim on those grounds.  See Amended RC

Motion at 10.

### 10.    **Massingill Motion Reply.**

Massingill replies.   See Defendant Warden Massingill's Reply Memorandum for his

Motion to Dismiss Count I of Plaintiff's First Amended Complaint and for Qualified Immunity

at 1, filed May 15, 2017 (Doc. 34)("Massingill Motion Reply").   Massingill contends that the

Court should dismiss the § 1983 claim against him, because the Amended Complaint contains

---

[2]The rest of the Amended RC Motion repeats arguments from the RC Motion.   See Amended RC Motion at 1-9; id. at 11.   The Court, accordingly, details only the new argument in this section.

only "vague" allegations about Massingill's conduct, which does not meet the <u>Twombly</u> standard. Massingill Motion Reply at 4. <u>See</u> <u>id</u> at 5 ("There is simply not one fact in the amended pleading -- not one -- which could support imposition of individual liability in this context.")(emphasis omitted). Massingill also asserts that he is entitled to qualified immunity, because Manzanares "has not even attempted to assert that there is any Supreme Court or Tenth Circuit authority" on point to satisfy qualified immunity's clearly established prong. Massingill Motion Reply at 6. Accordingly, Massingill requests that the Court to dismiss the § 1983 claims against him. <u>See</u> Massingill Motion Reply at 7.

### 11. <u>Amended RC Motion Response</u>.

Manzanares responds to the Amended RC Motion. <u>See</u> Response to Defendant Roosevelt's Amend Motion to Dismiss Plaintiff's First Amended Complaint On behalf of Commissioners of Roosevelt County, Larry Phillips and Charlene Webb at 1, filed May 26, 2017 (Doc. 37)("Amended RC Motion Response"). For the first time, Manzanares argues that, under rule 17(b) of the Federal Rules of Civil Procedure, Roosevelt County Detention is the proper party to be sued -- at least for a claim under the NMTCA. <u>See</u> Amended RC Motion Response at 3 (citing <u>Villa v. Dona Ana Cty.</u>, 2010 WL 16619163, at *5 (D.N.M. Sept. 14, 2010)(Black, J.)). Manzanares contends that Phillips and Webb are liable under 42 U.S.C. § 1983, because they set in motion a chain of events leading to the pickaxe attack, namely that they "simply ignor[ed] the classification of inmates upon booking into the RCDC facility." Amended RC Motion Response at 8 (citing FAC ¶¶ 42-43, at 8-9). Manzanares asserts that his negligence claim is still viable, because, as an employee of Roosevelt County Fairgrounds, the WCA exclusion does not apply. <u>See</u> Amended RC Motion Response at 10. He also argues that the NMTCA does not preclude his § 1983 claim. <u>See</u> Amended RC Motion Response at 12.

12.    **Amended RC Reply.**

Roosevelt County, Phillips, and Webb reply in support of the RC Amended Motion.  See Reply Memorandum of Roosevelt County Defendants in Support of Their Amended Motion to Dismiss Plaintiff's Amended Complaint at 1, filed June 14, 2017 (Doc. 41)("RC Amended Motion Reply").[3]  They argue that, although NMTCA does not preclude § 1983 claims, it precludes negligence claims.  See RC Amended Motion Reply at 14.  According to Roosevelt County, Phillips, and Webb, the Court should dismiss Manzanares' negligence claim, because the NMTCA precludes it.  See RC Amended Motion Reply at 14.

13.    **The Hearing.**

The Court held a hearing.  See Draft Transcript of Motion Proceedings at 1:1 (taken September 22, 2017)(Court)("Tr.").[4]  The Court began by noting that a plaintiff cannot sue detention centers under § 1983, so it is inclined to dismiss both Eddy County Detention and Roosevelt County Detention as parties.  See Tr. at 5:11-6:1 (Court).  Eddy County and Massingill argued that the Court should dismiss the § 1983 claims, because Manzanares has not alleged a constitutional violation, nor had he alleged a policy or practice that resulted in any constitutional violation.  See Tr. at 7:13-16 (Martinez).  They contend that Manzanares' allegation that Eddy County failed to tell Roosevelt County about Mendoza's classification cannot amount to a policy or practice leading to a constitutional violation, because "there is no allegation that this has ever occurred before or since."  Tr. at 9:16-19 (Martinez).  Eddy County

---

[3]In the RC Amended Motion Reply, Roosevelt County, Phillips, and Webb assert new arguments only with respect to the NMTCA waiver issue.  See RC Amended Motion Reply at 2. The Court details only their new arguments.

[4]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  If a final transcript is made, it may contain slightly different page and/or line numbers.

and Massingill assert that, rather than arguing that Eddy County's policy violates the Constitution of the United States of America, Manzanares has alleged that Eddy County violated its policy, which led to the harm.  See Tr. at 10:6-8 (Martinez)(citing FAC ¶ 69, at 13).

The Court posited that the FAC could be read to say that it is Eddy County's policy to dump dangerous inmates without a warning on Roosevelt County.  See Tr. at 10:13-17 (Court). Eddy County and Massingill responded that the FAC lacks any such allegations.  See Tr. at 10:18-24 (Martinez).  They add that the only plausible claim in the complaint is possibly negligence, but negligence does not amount to a substantive due process claim.  See Tr. at 11:1-13 (Martinez).

Manzanares responded that he is asserting that there was a custom or practice, which resulted in a substantive due process violation.  See Tr. at 13:5 (Zebas).  He conceded that he could not, without discovery, establish that there was a formal policy.  See Tr. at 12:25-13:1 (Zebas).  He asserts that the custom or practice in Eddy County is that, "in the event of overcrowding at one of their facilities, nonviolent offenders would be transferred."  Tr. at 13:12-16 (Zebas).  See id. at 14:7-23 (Court, Zebas)(identifying FAC ¶¶ 25-26, at 5-6, as the allegations that establish the custom or practice that he is asserting).  Upon the Court's questioning, Manzanares conceded that the custom identified "doesn't violate the United States Constitution" and it does not "shock the conscience."  Tr. at 14:14-15:4 (Court, Zebas).  See id. at 15:2-3 (Court)("That's probably just prudent management between two facilities, right?"). Manzanares also admitted that he was alleging that some individual employed with Eddy or Roosevelt County violated their policies.  See Tr. at 16:17-20 (Court, Zebas).

Manzanares then pivoted to argue that Eddy County and Roosevelt County did not train their staffs on the proper policies.  See Tr. at 18:5-9 (Zebas).  He also argued that Eddy County

acted with deliberate indifference to others' safety by transferring Mendoza "who has a pattern and practice of violent offenses." Tr. at 19:23-20:2 (Zebas). He concluded that "it really is shocking to the conscience that Mr. Mendoza fell through the system and was transferred to Roosevelt County in violation of an agreement that only nonviolent offenders would be transferred." Tr. at 21:7-11 (Zebas).

Eddy County and Massingill responded that Manzanares' claim amounts to a respondeat superior theory, which cannot lead to liability under § 1983. See Tr. at 22:3-11 (Martinez). They added that, even if someone "at the frontline level . . . made a mistake," there is no 42 U.S.C. § 1983 liability, because they would be entitled to qualified immunity. Tr. at 22:12-21 (Court, Martinez). Eddy County and Massingill contended that anyone failing to do a background check on a transferred inmate is, at best, negligent, so does not rise to the requisite conduct that "shocks the conscience." Tr. at 22:22-23:9 (Martinez). They added that, even if an employee "intentionally transported" a violent inmate, which is not alleged, such conduct does not "shock the conscience," because there are "so many procedural safeguards at Roosevelt County" to prevent harm that something else had to happen to lead to injury. Tr. at 24:1-16 (Martinez). See id. at 24:25-25:5 (Martinez).

Roosevelt County, Phillips, and Webb argued that the Court should dismiss the § 1983 claim against Roosevelt County, because "[t]here is no policy alleged." Tr. at 35:6 (Hatcher). They contended that the allegations here are that Roosevelt County was deliberately indifferent to Mendoza's violent/non-violent classification, which does not amount to liability under Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978)("Monell"). See Tr. at 35:6-22 (Hatcher). They also contended that there are failure-to-train, supervise, and failure-to-protect Manzanares allegations, but such allegations are conclusory, merely tracking the

Monell language.  See Tr. at 36:1-22 (Court, Hatcher).  Roosevelt County, Phillips, and Webb argue that Manzanares' constitutional claim is ultimately a respondeat superior theory, which does not give rise to liability.  See Tr. 38:1-14 (Hatcher).

Manzanares argued that Roosevelt County never reclassified Mendoza as they accepted him into Roosevelt County Detention, which, according to Manzanares, demonstrates a failure to train, supervise, or adequately screen.  See Tr. at 41:12-16 (Zebas); id. at 44:19-45:2 (Zebas).  Manzanares concedes, however, that he has no discovery concerning Roosevelt County's training and supervision policies.  See Tr. at 47:14-21 (Zebas).  Roosevelt County, Phillips, and Webb countered that the only allegation against Phillips and Webb is a conclusory assertion that they had "the final responsibility for training and supervision" at Roosevelt County Detention, which, according to Roosevelt County, Phillips, and Webb, cannot create liability.  Tr. at 52:1-16 (Hatcher)(citing FAC ¶ 78, at 15).

Eddy County and Massingill argued that Massingill is entitled to qualified immunity.  See Tr. at 63:2 (Martinez).  They contended that the only allegations against Massingill are conclusory assertions that, as Eddy County Detention's warden, he had "final responsibility for the training, supervision, management, and policy implementation" of Eddy County Detention.  Tr. at 63:11-21 (Martinez).  It follows, according to Eddy County and Massingill, that such bare allegations, with no factual meat, do not survive the Twombly standard.  See Tr. at 63:22-64:1 (Martinez).  Eddy County and Massingill also contended that there is no case law on point demonstrating that the law was clearly established, even if there is a constitutional violation.  See Tr. at 65:6-13 (Martinez).  Manzanares contended, to the contrary, that Massingill "had personal involvement," and that he caused harm to Manzanares, violating Manzanares' substantive due process right.  Tr. at 68:19-69:1 (Zebas).  He also argued that there is a case on point

demonstrating that the law is clearly established. See Tr. at 73:6-8 (Zebas)(citing Yvonne v. New Mexico Dep't of Human Servs., 959 F.2d 883, 884 (10th Cir. 1992)). According to Manzanares, in that case, the United States Court of Appeals for the Tenth Circuit ruled that, should there be a special relationship between the state and private citizens, there is a viable substantive due process claim. See Tr. at 73:16-24 (Zebas). The Court ended by stating its inclination that it would dismiss all of the federal claims and then dismiss the state claims without prejudice by declining to exercise supplemental jurisdiction. See Tr. at 96:6-12 (Court).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (2009)(citing Twombly, 550 U.S. at 555).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555.

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Board of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1258-59 (D.N.M. 2017)(Browning, J.).

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary

judgment.'"  Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d at 941; and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under

Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the Defendant's attach in their briefing. See Mocek v. City of Albuquerque, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the Defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court, in Crabtree, determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek

v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer to in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.    See Genesee Cty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Trust 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge).

## LAW REGARDING 42 U.S.C. § 1983 LIABILITY

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the

District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)). The Supreme Court of the United States of America has stated that there is no respondeat superior liability under 42 U.S.C. § 1983. See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to *Bivens*[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971)("Bivens")[5]] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell, 436 U.S. at 689). Supervisors can be held liable only for their own unconstitutional or illegal

---

[5]In Bivens, the Supreme Court held that a violation of the Fourth Amendment of the Constitution of the United States of America "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U.S. at 389.

policies, and not for the employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.    **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995). The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the public employee context, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of

constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[6]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there is not a superseding-intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." Id. In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment of the Constitution of the United States of America, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a

---

[6]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273. The Court applied a traditional proximate cause analysis, and left open the possibility that there might be some greater, undefined causation requirement. See 41 F. Supp. 3d at 1281.

superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States

Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice

for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, <u>see</u> Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. <u>See</u> <u>id.</u> § 440.

<u>Trask v. Franco</u>, 446 F.3d at 1046 (quoting <u>Bodine v. Warwick</u>, 72 F.3d at 400). Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility." <u>Trask v. Franco</u>, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., <u>Prosser and Keeton on Torts</u> § 44, at 303-04 (5th ed. 1984)). If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

<u>Trask v. Franco</u>, 446 F.3d at 1047 (citing <u>Restatement (Second) of Torts</u> § 453 cmt. b (1965)).

**3.      Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, . . . exercise of control or direction, or . . . failure to

supervise.'" <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting <u>Green v.</u>

<u>Branson</u>, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted). Because

supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted). Cf. Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199. The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200. It concluded that Ashcroft

v. Iqbal does not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200. The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined." Dodds v. Richardson, 614 F.3d at 1200 n.8. Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, 520 U.S. 397 (1997), the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted). The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself

violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.  **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a

distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). See Bivens, 403 U.S. at 392. "The qualified immunity analysis is the same whether the claims are brought under *Bivens* or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights. To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); see also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1. Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[7] the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely

---

[7]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

to face challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[8]  "Courts should think carefully before expending

---

[8]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[9] See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong. See Kerns v. Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

---

(2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[9]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation. It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court. Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice. The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing. In practice, Saucier v. Katz worked better.

## 2. **Clearly Established Rights.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."

Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction might make a constitutional difference." Kerns v. Bader, 663 F.3d at 1188. In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is

the appropriate analysis, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II").

In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148

(10th Cir. 2015)("Aldaba I") that officers were entitled to qualified immunity after the Supreme

Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam).   In

concluding that they had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one.  Although we cited *Graham v. Connor*, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741[].  This calls to mind our sliding-scale approach measuring the egregiousness of conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730, [] (2002).  As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. 548, 551

(2017)(per curiam). In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case." White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640). With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552. See District of Columbia v. Wesby, 138 S. Ct. at 591 ("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances."). Although the Supreme Court noted that "we have held that [Tennessee v.] Garner[, 471 U.S. 1 (1985)] and Graham do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham." 137 S. Ct. at 552.[10]

---

[10]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a nigh identical case must exist for the law to be clearly established. As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. *See* Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). Although still stating that there might be an obvious case under Graham that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, see Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme

Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, (U.S. Supreme Court, filed Mar. 2, 2018)()("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 CAL. L. REV. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in

## LAW REGARDING SUBSTANTIVE DUE–PROCESS CLAIMS

The Due Process Clause of the Fourteenth Amendment of the United States of America provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cty., 489 U.S. at 197). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."

enacting the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(internal quotation marks omitted). "Our qualified immunity precedents instead represent precisely the sort of freewheeling policy choice[s] that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(internal quotation marks omitted). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 2018 WL 3660248, at *4-10 (10th Cir. 2018)(unpublished); Malone v. Board of County Comm'rs for County of Dona Ana, 2017 WL 3951706, at *3; Brown v. The City of Colorado Springs, 2017 WL 4511355, at *8, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

DeShaney v. Winnebago Cty., 489 U.S. at 195. The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty., 489 U.S. at 195.

### 1. **Exceptions to the General Rule.**

There are, however, two exceptions to the general rule. The first -- the special-relationship exception -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994–95 (10th Cir. 1994). The second -- the danger-creation exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)). The Court's decision in Glover v. Gartman was also consistent with a previous Tenth Circuit decision -- Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998) -- in which the Tenth Circuit stated:

> It is true, of course, that state actors are generally only liable under the Due Process Clause for their own acts and not private violence. There are, however, two exceptions to that rule. First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison. Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that harm is ultimately inflicted by a private party. The shocks the conscience standard applies to both types of suits.

Radecki v. Barela, 146 F.3d at 1230.

## 2. **The Special-Relationship Exception.**

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the due process clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (*e.g.,* when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

## 3. **The Danger-Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)). To state a prima-facie case, the plaintiff must show that his or her danger-creation claim for due-process violations meets a six-part test: (i) the state and individual actors must have created the

danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M.2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE–2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."  Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992).  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### 4.     **What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore

v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)). "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995)).

> Establishing these limits advances
>
> three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety.

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574). "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M.2011)(Browning, J.), aff'd, 511 F. App'x. 742 (10th Cir. 2013)(unpublished)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively")).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates. See 265 F.3d at 1132. The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience." 265 F.3d at 1134. The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiff's substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[11] the plaintiff's son. 716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience. See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [J.H.' son] from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked. . . .

> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

---

[11] The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles." 716 F. Supp. 2d at 1059 n.2.

716 F. Supp. 2d at 1074-75.

<h1 style="text-align:center">ANALYSIS</h1>

The Court will dismiss Eddy County Detention and Roosevelt County Detention, because they are not proper parties in a § 1983 suit. The Court concludes that Eddy County's failure to classify Mendoza as a dangerous inmate and Mendoza's resulting transfer to Roosevelt County Detention, while perhaps careless, does not amount to conduct that shocks the conscience. Accordingly, the Court grants the EC Motion in part and dismisses the § 1983 claim against Eddy County and the § 1983 claim brought against Massingill in his official capacity. Similarly, the Court concludes that Roosevelt County's failure to re-classify Mendoza does not amount to conduct that shocks the conscience. The Court, thus, grants the RC Motion and Amended RC Motion in part and dismisses the § 1983 claims against Roosevelt County and Phillips and Webb in their official capacities. Because there is no underlying constitutional violation, Massingill is entitled to qualified immunity, but the Court also concludes that, even if there were a violation, the law is not clearly established, so he would still be entitled to qualified immunity. The Court accordingly grants the Massingill Motion and dismisses the § 1983 claim brought against Massingill in his personal capacity. The failure to train and/or supervise allegations against Phillips and Webb are conclusory, so the Court disregards them. Moreover, there is no underling conduct that shocks the conscience. Manzanares has therefore not stated a claim against those two individuals, so the Court dismisses the § 1983 claims against them in their personal capacity. With those rulings, there are no more federal claims before the Court. Accordingly, the Court declines to exercise supplemental jurisdiction and dismisses the remaining state claims without prejudice.

## I.   EDDY COUNTY DETENTION CENTER AND ROOSEVELT COUNTY DETENTION CENTER ARE NOT PROPER PARTIES.

Pursuant to § 1983, only "persons" can be liable.  42 U.S.C. § 1983.  Manzanares sues Eddy County Detention and Roosevelt County Detention under § 1983.  See FAC ¶¶ 2, 7, at 2-3.  The Court will dismiss them, however, because detention centers are not persons as 42 U.S.C. § 1983 requires.  See, e.g., Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs., 272 F. Supp. 3d 1256, 1267 (D.N.M. 2017)(Browning, J.); Apodaca v. New Mexico Adult Probation and Parole, 998 F. Supp. 2d 1160, 1190 (D.N.M. 2014)(Browning, J.).

## II.   MANZANARES HAS NOT STATED A SUBSTANTIVE DUE PROCESS CLAIM AGAINST EDDY COUNTY.

Eddy County is not liable under substantive due process for Mendoza's pickaxe attack. In general, municipal governments hold no due process obligation to protect individuals from private acts of violence.  See DeShaney v. Winnebago Cty. Dept. of Soc. Servs., 489 U.S. at 197. When, however, "a state actor affirmatively acts to create, or increase a plaintiff's vulnerability to" private violence, a due process claim lies.  See Robbins v. Oklahoma, 519 F.3d at 1251. Municipal liability attaches under § 1983 when a constitutional violation results from a municipality's: (i) official policy; (ii) custom or practice; or (iii) failure to train employees.  See City of Canton v. Harris, 489 U.S. 378, 380, 387 (1989); Monell,436 U.S. at 690-91.[12]

---

[12]Manzanares contends that there is a fourth method of demonstrating municipality liability; namely, that liability attaches if a plaintiff shows that a final decisionmaker's single decision or act causes a constitutional violation.  See EC Motion Response at 4.  Although "municipal liability may be imposed for a single decision by municipal policymakers," that approach is simply a way of showing that an official policy exists.  Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986)("If the decision to adopt that particular course of action is properly made by the government's authorized decisionmakers, it surely represents an act of official 'policy' as the term is commonly understood.").

Manzanares asserts that his theory of liability is premised on Eddy County's custom or practice of transferring nonviolent offenders to other detention facilities in the event of overcrowding. See EC Motion Response at 5; Tr. at 13:8-14:23 (Court, Zebas).[13] That custom or practice, however, does not cause a substantive due process violation. Transferring nonviolent offenders creates little, if any, risk of violence.

After conceding at the hearing that the policy alleged would not lead to a constitutional violation, see Tr. at 14:24-15:5 (Court, Zebas), Manzanares argued that Eddy County's failure to train its employees about its policy created a risk of private violence, ultimately culminating in Mendoza's pickaxe attack, see Tr. at 18:5-9 (Zebas). See also EC Motion Response at 5-6. To prevail under the failure-to-train approach, a plaintiff must show that the municipality made a "deliberate or conscious choice" to not train its employees, and that the municipality was deliberately indifferent to its inhabitants' constitutional rights. City of Canton v. Harris, 489 U.S. at 388-89. See Collins v. City of Harker Heights, 503 U.S. 115, 123-24 (1992). Manzanares' Amended Complaint, however, contains only conclusory allegations that Eddy County failed to train its employees. See FAC ¶ 62, at 13 ("Defendants deliberately failed to ensure proper training and supervision of penitentiary personnel."); id. ¶ 65, at 13. Moreover, the Amended Complaint lacks factual allegations supporting a plausible inference that Eddy County failed to train its employees, because, at best, it asserts that, one time, unspecified Eddy County employees violated its policy of transferring only non-violent inmates. See FAC ¶¶ 25,

---

[13]Manzanares' FAC asserts another custom or practice that he appears to have abandoned, as he did not raise it at the hearing. Specifically, he asserts that Eddy County had a practice or custom of "dumping unwanted inmates onto other detention facilities" and deliberately or with reckless disregard "refused to provide appropriate classification information." FAC ¶ 66, at 13. The Court address infra why that custom or practice also fails to state a claim.

63 at 5, 12.[14]   A one-time violation might demonstrate that the violation is the result of Eddy

County's failure to train its employees, but it seems equally as likely, if not more likely, that one

violation could be the result of an errant employee.  Cf. Connick v. Thompson, 563 U.S. 51, 62

(2011)("A pattern of similar constitutional violations by untrained employees is ordinarily

necessary to demonstrate deliberate indifference."); Coffey v. McKinley Cty., 504 F. App'x 715,

719 (10th Cir. 2012)(unpublished)("One prior incident, even if it was a constitutional violation

sufficiently similar to put officials on notice of a problem, does not describe a pattern of

violations.").[15]   Although a plaintiff does not need to allege multiple constitutional violations to

successfully plead a failure-to-train claim, see Cruz v. City of Merriam, 21 F. Supp. 3d 1777,

---

[14]Manzanares allegation that "RCDC, ECDC and its individual Defendants further
manifested deliberate indifference by their numerous and repeated violation of policy," is
conclusory, so the Court disregards it.  FAC ¶ 69, at 13.  See Ashcroft v. Iqbal, 556 U.S. at 678-
79

[15]There is a circumstance when it is "so patently obvious" that a failure to train would
lead to "unconstitutional consequences" that a pattern need not be shown or plausible.  Connick
v. Thompson, 563 U.S. at 63.  The Supreme Court has given the hypothetical example of a city
that equips its police force with firearms, deploys them into the public "to capture fleeing
felons," but fails to train them about the Fourth Amendment's bar on the use of deadly force.
563 U.S. at 63.

> Given the known frequency with which police attempt to arrest fleeing felons and
> the predictability that an officer lacking specific tools to handle that situation will
> violate citizens' rights, . . . a city's decision not to train the officers about
> constitutional limits on the use of deadly force could reflect the city's deliberate
> indifference to the highly predictable consequence, namely, violations of
> constitutional rights.

563 U.S. at 63-64.
Here, there is a break in the causation chain, which forecloses this exceptional
circumstance.  Most, if not all, correctional institutions receiving inmates have their own intake
and classification procedures that flag inmates' criminal history.  Thus, even if there was a
failure on Eddy County's end, the other correctional institution would have a good chance of
preventing any constitutional violations by correctly labeling a transferred inmate with a violent
past.

1185 (D. Kan. 2014)(Marten, J.), the Court is not satisfied that the allegations in Manzanares'

Amended Complaint nudge the claim into the realm of plausibility. Accordingly, the Court

concludes that Manzanares has not stated a claim against Eddy County.[16]

Even if the Court concluded in Manzanares' favor on the requisite failure-to-train

allegations, however, the Court would still conclude that he has not plausibly stated that the

failure to train caused a substantive due process violation under the danger-creation strand of

liability. To state a prima facie danger-creation claim, the plaintiff must show:

> (1) state actors created the danger or increased the plaintiff's vulnerability to the
> danger in some way, (2) the plaintiff was a member of a limited and specifically
> definable group, (3) the defendants' conduct put the plaintiff at substantial risk of
> serious, immediate, and proximate harm, (4) the risk was obvious or known,
> (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the
> conduct, when viewed in total, shocks the conscience.

Robbins v. Oklahoma, 519 F.3d at 1251.

First, the conduct here does not shock the conscience. See Martinez v. Uphoff, 265 F.3d

at 1133 ("[T]he shock the conscience standard requires a high level of outrageousness."); Uhlrig

v. Harder, 64 F.3d at 574 ("[A] substantive due process violation requires more than an ordinary

tort."). As the Court has remarked previously, the test is not whether the end result is conscience

shocking; rather, it is whether the particular defendants' conduct is conscience shocking. See

Valdez v. Roybal, 186 F. Supp. 3d 1197, 1268 (D.N.M. 2016)(Browning, J.). Thus, while the

end result here -- a pickaxe attack -- might be shocking, Eddy County's failure to train its

employees about properly classifying inmates' violent history is more akin to negligence. See

Saenz v. Lovington Mun. School Dist., 105 F. Supp. 3d 1271, 1313 (D.N.M.

2015)(Browning, J.)(holding that negligence "is not so outrageous that it shocks the

---

[16]This conclusion disposes of the federal claims against Eddy County and Massingill in
his official capacity.

conscience"). Indeed, confronted with similar facts, the Tenth Circuit concluded likewise. See Martinez v. Uphoff, 265 F.3d at 1134-35. In Martinez v. Uphoff, three inmates murdered a prison guard while attempting to escape the prison. See 265 F.3d at 1132. According to the plaintiff, the prison knew that two of the inmates had violent histories, it knew or should have known of the planned escape attempt, it knew that the prison was understaffed, and it failed to properly train its prison employees. See 265 F.3d at 1132. Nevertheless, the Tenth Circuit concluded that the prison's conduct did not shock the conscience, because, at best, it signaled "inaction in the face of known dangers or risks." 265 F.3d at 1135. If anything, Eddy County's conduct here is less outrageous than the prison's conduct in Martinez v. Uphoff. In that case, the prison knew or should have known of the prisoner's plan to-escape and thus the risks such an undertaking poses, whereas, here, Eddy County did not know nor should it have known that Roosevelt County would allow Mendoza to work on the fairgrounds with little supervision. Accordingly, Eddy County's conduct does not satisfy the shocks-the-conscience standard.

In addition, Manzanares has not stated a danger-creation claim, because that theory requires an allegation of affirmative state conduct that imposes "an immediate threat of harm, which by its nature has a limited range and duration, and is directed at a discrete plaintiff rather than the public at large." Hernandez v. Ridley, 734 F.3d 1254, 1259 (10th Cir. 2013). See Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002). Even if Eddy County failed to train its employees, that conduct cannot be fairly said to have been directed at Manzanares as a discrete plaintiff. Manzanares does not work for Eddy County. He has no relationship with Eddy County Detention. He is, in fact, not a prison official at all. See FAC ¶ 18, at 4-5. Rather, Manzanares is a maintenance worker for Roosevelt County -- a county separated from Eddy County Detention by at least a hundred miles. See FAC ¶¶ 18-19, at 4-5. Given how unconnected

Manzanares is from Eddy County and Eddy County Detention, the Court concludes that Eddy County Detention's policies were not directed at Manzanares. See Hernandez v. Ridley, 734 F.3d at 1260 ("Thus, the polices were not aimed at the[ defendants] directly and did not pose a threat of immediate harm to him.").[17] Accordingly, Manzanares has not stated a due process claim against Eddy County.

## III. MANZANARES HAS NOT STATED A SUBSTANTIVE DUE PROCESS CLAIM AGAINST ROOSEVELT COUNTY.

For similar reasons, Manzanares has not stated a due process claim against Roosevelt County. Manzanares' claim against Roosevelt County is premised on the theory that Roosevelt County violated its "custom of allowing [only] non-violent inmates to work in the community" when it allowed Mendoza to work on the fairgrounds. RC Motion Response at 4. See id. at 6-7. Violating a custom or practice, however, does not give rise to municipal liability; rather, the custom or practice must cause a constitutional violation. See Monell, 436 U.S. at 691. A custom of allowing non-violent inmates to work in the community does not cause any constitutional violations. See supra, § II.

Manzanares also asserts that the policy violation demonstrates that Roosevelt County was deliberately indifferent to supervising and training its officers about the policy. See FAC ¶¶ 40, 65, 70, at 7, 13-14. Manzanares adds that the policy violation shows that Roosevelt County had a policy of not classifying inmates' violent history as Roosevelt County Detention accepted transferred inmates. See Tr. at 41:2-6 (Zebas). Construing these allegations as a failure-to-train

---

[17]For similar reasons, Manzanares' abandoned allegation that Eddy County had a custom or practice of "dumping unwanted inmates" onto other facilities also fails to state a claim. FAC ¶ 66, at 13. Such a custom cannot be said to be directed at Manzanares -- an individual who does not work at Roosevelt County Detention. Moreover, dumping unwanted inmates, even with subterfuge, may be inequitable to other detention facilities, but it does not shock the conscience. See infra § III (demonstrating that the shocks-the-conscience standard is an abnormally high bar).

theory, the Court concludes that Manzanares has failed to state a claim for the same reasons that he fails to state a claim under a failure-to-train theory against Eddy County. See supra § II. Manzanares' allegations asserting that Roosevelt failed to train and or supervise its employees are conclusory. See FAC ¶ 65, at 13 ("In this case Defendants and each of them deliberately failed to ensure proper training and supervision of its personnel, deliberately failed to provide safe and adequate staffing, proper training, proper classification and deliberately failed to take corrective action to protect Plaintiff's constitutional rights."). Manzanares' only fact supporting an inference that Roosevelt County failed to train its employees or that it had a policy of not classifying inmates, is that Mendoza -- a violent inmate -- was misclassified as a non-violent inmate. See FAC ¶¶ 19, 31-32, at 5-7; Tr. at 41:2-6 (Zebas). That Mendoza -- one inmate -- was misclassified does not create a reasonable inference that the misclassification resulted from a widespread policy of poor classification procedures or of a failure to train. See supra, § II; Tr. at 48:1-3 (Court)("[Y]ou can train employees [un]til you're blue in the face and they sometimes misclassify people."). Accordingly, Manzanares has not stated a claim against Roosevelt County.[18]

In addition, even if Manzanares hurdles the Monell municipality-liability barrier, he still stumbles over similar underlying substantive due process problems that he had with his claims against Eddy County. Failure to train employees about proper classification of inmates' violent history does not shock the conscience. See supra, § II. Moreover, a policy of no classification system for transferred inmates does not cross the shock-the-conscience finish line. See Martinez v. Uphoff, 265 F.3d at 1135 (concluding that, under that case's circumstances, "inaction in the face of known dangers or risks [is] not enough to satisfy the danger-creation theory's conscience

---

[18]This conclusion disposes of the federal claims against Roosevelt County and Webb and Phillips in their official capacities.

standard."). That conclusion is not to suggest that a failure to classify inmates' security level is not troubling conduct that might rise to or even exceed negligent behavior. The shocks-the-conscience standard, however, imposes an extremely high burden. See, e.g., Muskrat v. Deer Creek Public Schools, 715 F.3d 775, 780-81, 787 (10th Cir. 2013)(concluding that a teacher, who, without provocation, slapped a disabled child, did not shock the conscience); Williams v. Berney, 519 F.3d 1216, 1219, 1225-26 (10th Cir. 2008)(holding that a business-license inspector who, "without provocation," pushed, shoved, and repeatedly "struck" the owner of a doggie daycare for not photocopying something fast enough did not shock the conscience); N.F. on behalf of M.F. v. Albuquerque Public Schools, 2015 WL 13667294, at *5 (D.N.M. Jan. 30, 2015)(Yarbrough, M.J.)(concluding that a sixth-grade teacher's numerous and unwanted sexual advances toward one of his students culminating in him sliding his hand across her vagina shocked the conscience only because the sexual advances culminated with the unwanted genital touching); Hall v. Zavaras, 2008 WL 5044553, at *4 (D. Colo. Nov. 19, 2008)(Ebel, J.[19])(ruling that a prison facility, which had actual knowledge that one of its guards systematically sexually abused female inmates, yet did nothing, leading to a "brutal rape," shocked the conscience). The Court concludes, accordingly, that Manzanares has not stated a claim against Roosevelt County.

## IV. THE COUNTIES' INDIVIDUAL EMPLOYEES HAVE NOT VIOLATED DUE PROCESS AND, IF THEY HAVE, THEY ARE ENTITLED TO QUALIFIED IMMUNITY.

In addition to Eddy County and Roosevelt County, Manzanares asserts due process claims against Webb, Phillips, and Massingill in their personal capacities. See FAC ¶¶ 4-5, 9, at

---

[19]Judge David Ebel is a Senior Circuit Judge for the Tenth Circuit.

2-3.[20]  The Court dismisses Manzanares' claims against those individuals, because his allegations

against them, at best, assert the same conduct as he asserts against Eddy County and Roosevelt

County.  Accordingly, there is no due process violation.  Even if there were, however, the law is

not clearly established, so qualified immunity would attach.

### A.     PHILLIPS, WEBB, AND MASSINGILL HAVE NOT VIOLATED DUE PROCESS.

Phillips, Webb, and Massingill have not taken any action that shocks the conscience, so

they have not violated due process.  Phillips is Roosevelt County Detention's warden.  See FAC

¶ 4, at 2.  Webb is either the Roosevelt County Manager or the Roosevelt County Commissioner,

---

[20]The Amended Complaint also names Mendoza, John and Jane Doe detention center officers of Eddy and Roosevelt County, John Does I-X, Jane Does I-X, and Black and White Corporations I-X.  See FAC ¶¶ 6, 10-12, at 3-4.  The Court is inclined to sua sponte dismiss the § 1983 claim against Mendoza, because, as an inmate, he is not a state actor.  See Lucker v. Davies, 951 F.2d 1259, 1259 (10th Cir. 1991)(unpublished).  See also Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991)(holding that a district court may dismiss a claim sua sponte "when it is patently obvious that the plaintiff could not prevail on the facts alleged").  The Court will dismiss the § 1983 claim against Mendoza, but will do so without prejudice, so that Manzanares may file a motion to amend should he be able to allege facts demonstrating that Mendoza is a state actor and is otherwise plausibly liable under § 1983.

The Court is also inclined to dismiss the claims against the John and Jane Does, and the Black & White Corporations.  Although courts "have generally recognized the ability of a plaintiff to use unnamed defendants," that is true "so long as the plaintiff provides an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served."  Roper v. Grayson, 81 F.3d 124, 126 (10th Cir. 1996).  The Amended Complaint contains, however, no information about these individuals, let alone an "adequate description . . . sufficient to identify the person."  Roper v. Grayson, 81 F.3d at 126.  See FAC ¶¶ 1-81, at 1-5.  Manzanares represents that these John and Jane Does are detention center employees "involved in the classification and transport of Defendant Mendoza," and that discovery will reveal who they are.  EC Motion Response at 3-4.  Based on those representations, it appears that the § 1983 claims against those officials would fail for the same reasons that they fail against Phillips, Webb, and Massingill.  Manzanares does not state anything about the Black and White Corporations.  See EC Motion Response at 3-4.  Accordingly, the Court will dismiss the § 1983 claims against the John and Jane Does and the Black and White Corporations, but will do so without prejudice.  Manzanares may file a motion to amend should he be able to allege facts plausibly establishing a claim against these defendants.  The Court will, accordingly, amend the Order such that the federal claims against Mendoza, the John and Jane Does, and the Black and White Corporations are dismissed without prejudice.

or both.  See FAC ¶¶ 5, at 1-2.[21]  Massingill is Eddy County Detention's warden.  See FAC ¶ 9, at 3.  Apart from naming their respective positions, the only other allegations in the FAC referring to those defendants state:

> 77.    As the official policy maker, . . . Warden Massingill had final responsibility for the training, supervision, management and policy implementation of the ECDC and are liable to the Plaintiff for acts and/or omissions of the individual defendants.
>
> 78.    As the official policy maker, the Roosevelt County Board of Commissioners, the Roosevelt County Manager and Warden Phillips had final responsibility for the training, supervision, management and policy implementation of the RCDC and are liable to Plaintiffs for the acts and/or omissions of the individual Defendants.

FAC ¶¶ 77-78, at 15.  Apart from asserting generally that Phillips, Webb, and Massingill had the final responsibility of training, management, and policy implementations, those allegations contain no factual assertions about any affirmative act which Phillips, Webb, or Massingill performed.  See Hernandez v. Ridley, 734 F.3d at 1259 (requiring affirmative conduct from state actors to impose due-process liability).  See also Ashcroft v. Iqbal, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  To be sure, a supervisor "who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" may be held liable if that policy causes a constitutional violation, Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010), but the allegations in the amended complaint are merely conclusory assertions that Phillips, Webb, and Massingill, as high-ranking individuals, had supervisory authority over the training at and the policies of Eddy County Detention and Roosevelt County Detention.  Accordingly, the Court need not accept those

---

[21]There is some ambiguity in the FAC, because Webb is listed in the caption as the County Manager, whereas in the FAC's body she is named the County Commissioner.  See FAC ¶¶ 5, at 1-2.  There is no explanation whether the positions are one and the same, or if they are separate positions.

allegations as true.  See Ashcroft v. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action . . . do not suffice.").  Even accepting as true, however, that Phillips, Webb, and Massingill were involved in Eddy County's and Roosevelt County's purported failure to train its employees about classifying inmates, or that Phillips and Webb were responsible for Roosevelt County's purported lack of a classification system, such conduct does not shock the conscience.  See supra §§ II-III.  Accordingly there is no due process violation.

**B.      EVEN IF THERE IS A DUE PROCESS VIOLATION, THE LAW IS NOT CLEARLY ESTABLISHED.**

Massingill asserts qualified immunity as a defense.  See Massingill Motion at 1.  State officials are entitled to qualified immunity under § 1983, unless: (i) they violate a federal or statutory or constitutional right; and (ii) the unlawfulness of their conduct "was clearly established at the time."  District of Columbia v. Wesby, 138 S. Ct. at 589.  Massingill is entitled to qualified immunity, because he has not violated a federal statutory or constitutional right.  Assuming, however, that his conduct has violated a right, he would still be entitled to qualified immunity, because the law is not clearly established.[22]

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The plaintiff bears the burden of showing that the law is clearly established.  See Kerns v. Bader, 663 F.3d at 1180.  "[T]he law is not clearly established where 'a distinction might make a constitutional difference.'"  McGarry v. Board of County Commissioners for County of Lincoln, 294 F. Supp. 3d 1170, 1187 (D.N.M. 2018)(Browning, J.)(quoting Kerns v. Bader, 663 F.3d at

---

[22]Neither Phillips nor Webb has asserted a qualified immunity defense, but the Court's analysis and conclusion would be functionally identical for them.

1188).  As explained above, and in prior cases, the Court has observed that "the Supreme Court has sent out unwritten signals to the lower courts that [a] factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts."  Nelson v. City of Albuquerque, 283 F. Supp. 3d 1048, 1107 n.44 (D.N.M. 2017)(Browning, J.).  See White v. Pauly, 137 S. Ct. at 552 ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.").

Here, Manzanares asserts that the closest Tenth Circuit decisions on point are Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008), Armijo ex rel. Chavez v. Wagon Mound Public Schools, 159 F.3d 1253 (10th Cir. 1998)("Armijo"), and Yvonne ex rel. Lewis  v. New Mexico Department of Human Services, 959 F.2d 883 (10th Cir. 1992)("Yvonne").  See Tr. at 73:6-8 (Zebas); id. at 76:17-20 (Zebas).  The Court concludes that they are not factually analogous enough to signal to a "reasonable official" that existing law has "placed the constitutionality" of the "conduct beyond debate."  District of Columbia v. Wesby, 138 S. Ct. at 589.

Yvonne involves a minor child whom another child raped at a foster home facility.  See 959 F.2d at 885.  The minor child contended that state officials failed to properly ensure staffing and supervision at the facility and failed to screen children who might pose a threat to others, which ultimately led to the sexual assault.  See 959 F.2d at 885, 890.  Although the failure to screen dangerous children contention in Yvonne is similar to Manzanares' argument that Roosevelt County failed to properly classify inmates with violent histories, the two cases' resemblance ends there.  The claim in Yvonne is premised on the special-relationship prong of substantive due process liability, whereas Manzanares' claim centers on the danger-creation prong.  See Yvonne, 959 F.2d at 892-93; EC Motion Response at 8.  Given that difference, a

state official might reasonably wonder whether <u>Yvonne</u> applies to the conduct affecting Manzanares. A state official's constitutional responsibilities toward children in the foster care context might be different or stricter than a state official's constitutional responsibilities toward county officials in the prison context.

In <u>Armijo</u>, a special education student committed suicide after school officials suspended him, drove him home, and left him unattended with access to firearms. <u>See</u> 159 F.3d at 1257. The child's parents sued under a substantive due process theory, asserting that the school knew that their child had been depressed and had previously threatened to commit suicide. <u>See</u> 159 F.3d at 1257. Manzanares' claim diverges from <u>Armijo</u> in that it deals with Detention Center officials, whether those officials were properly trained, and whether there was a proper classification system for inmates. In contrast, <u>Armijo</u> turns on a student's suicidal tendencies and whether disciplinary action caused that student to take his own life. The Court concludes that the facts of <u>Armijo</u> are too disparate to demonstrate that the law was clearly established.

Finally, <u>Robbins v. Oklahoma</u> arises from the tragic murder of an eight-month old infant. 519 F.3d at 1245. There, the infant's parents placed their child in a daycare based on a representation from the Oklahoma Department of Human Services that the specific daycare recommended was the only place the parents could use and receive financial assistance from the State of Oklahoma. <u>See</u> 519 F.3d at 1246. After the daycare's owner murdered their child, the parents filed suit, asserting a due process violation. <u>See</u> 519 F.3d at 1246. This case provides no support for Manzanares that the law is clearly established, because the Tenth Circuit concluded in <u>Robbins v. Oklahoma</u> that the parents had not stated a due process violation. <u>See</u> 519 F.3d at 1250-53. Even if the facts alleged in <u>Robbins v. Oklahoma</u> had supported a due process violation, however, they are dissimilar enough from Manzanares' facts that they would not show

that the law is clearly established. Manzanares' case involves no children, no daycare officials, and liability is not premised on the reliance of state officials' representations; rather, it is premised on state officials' purported failure to train, supervise, and/or classify inmates' threat levels.

The most factually analogous case that the Court could find to this case is Martinez v. Uphoff, which the Court has already cited for the proposition that there is no due process violation. See supra, §§ II-III. In Martinez v. Uphoff, three inmates who were attempting to escape murdered a prison guard, and the prison guard's family sued the prison, asserting a due process claim. See 265 F.3d at 1132. The family asserted, under the danger-creation prong, that the prison knew or should have known of the escape plan, and that it knew that two of the three inmates attempting escape had violent histories, yet the prison did nothing to stop the escape attempt. See 265 F.3d at 1132. The Tenth Circuit ultimately concluded, however, that the prison's conduct did not shock the conscience, so it affirmed the district court's grant of summary judgment in the prison's favor. See 265 F.3d at 1135. Given that the closest case to Manzanares' case resulted in dismissal, the Court concludes that the law was not clearly established that Massingill committed a constitutional violation.

## V. THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE STATE CLAIMS AND DISMISSES THEM.

Having disposed of the § 1983 claims, the only remaining claims before the Court are Manzanares' negligence and/or gross negligence claims. See FAC ¶¶ 72-81, at 14-15. The Court declines to exercise supplemental jurisdiction over those claims. See 28 U.S.C. § 1367(c)(3); Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009)("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); United States v. Botefuhr, 309 F.3d

1263, 1273 (10th Cir. 2002)(concluding that, if a district court has not already spent a lot of time and energy on a state law claim, it "should normally dismiss supplemental state law claims after all of the federal claims have been dismissed").  Accordingly, the Court will dismiss those claims without prejudice.

**IT IS ORDERED** that the Order, filed September 25, 2017 (Doc. 47), is amended so that Manzanares' federal claims against Defendants Senovio Mendoza, Jr., John and Jane Doe detention officers of the Eddy County Detention Center, John Does I-X, Jane Does I-X, Black and White Corporations, and all John Does and Jane Does are dismissed without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph M. Zebas
Zebas Law Firm L.L.C.
Hobbs, New Mexico

    *Attorney for the Plaintiff*

Scott P Hatcher
Hatcher Law Group P.A.
Santa Fe, New Mexico

    *Attorney for Defendants Board of Commissioners of the County of Roosevelt, Larry Phillips, and Charlene Webb*

Jonlyn M. Martinez
Law Firm of Jonyln M. Martinez
Albuquerque, New Mexico

    *Attorney for Defendants Eddy County Detention Center, Board of Commissioners of the County of Eddy, and Billy Massingill*